**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

CHRISTOPHER GARNIER; KIMBERLY GARNIER,

*Plaintiffs-Appellees/ Cross-Appellants*,

v.

MICHELLE O'CONNOR-RATCLIFF; T.J. ZANE,

*Defendants-Appellants/ Cross-Appellees*.

</td>
<td>

Nos.  21-55118
      21-55157

D.C. No.
3:17-cv-02215-BEN-JLB

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted March 11, 2022
Pasadena, California

Filed July 27, 2022

Before: Marsha S. Berzon, Richard C. Tallman, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's bench trial judgment in favor of plaintiffs in an action brought pursuant to 42 U.S.C. § 1983 alleging that two members of the Poway Unified School District Board of Trustees violated plaintiffs' First Amendment rights by ejecting plaintiffs from social media pages that the Trustees had used to communicate with constituents about public issues.

The panel noted that plaintiffs' claims presented an issue of first impression in this Circuit: whether a state official violates the First Amendment by creating a publicly accessible social media page related to his or her official duties and then blocking certain members of the public from that page because of the nature of their comments.

The panel held that, under the circumstances presented here, the Trustees acted under color of state law by using their social media pages as public fora in carrying out their official duties. The panel further held that, applying First Amendment public forum criteria, the restrictions imposed on the plaintiffs' expression were not appropriately tailored to serve a significant governmental interest and so were invalid. The panel concluded that the Trustees violated plaintiffs' First Amendment rights and that the district court was therefore correct to grant plaintiffs declaratory and injunctive relief.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the Trustees' assertion that the dispute was moot because after plaintiffs filed their lawsuit, the Trustees began using a word filter on Facebook to prevent any new comments from being posted on their Facebook pages, thereby closing the Facebook pages as public fora. The panel held that: (1) using a word filter on Facebook would not affect plaintiff Christopher Garnier's claims involving being blocked from Twitter; (2) the word filter limit did not change Facebook's non-verbal "reaction" feature; and (3) the Trustees failed to carry their burden of showing they would not, in the future, remove the word filters from their Facebook pages and again open those pages up for verbal comments from the public.

The panel next rejected the Trustees' assertion that creating, maintaining, and blocking plaintiffs from their social media accounts did not constitute state action under § 1983. Both through appearance and content, the Trustees held their social media pages out to be official channels of communication with the public about the work of the Poway Unified School District Board. Given the close nexus between the Trustees' use of their social media pages and their official positions, the Trustees in this case were acting under color of state law when they blocked plaintiffs.

The panel rejected the Trustees' assertion that blocking plaintiffs was a narrowly tailored time, place, or manner restriction. Even if plaintiffs' comments did interfere with the Trustees' interests in facilitating discussion or avoiding disruption on their social media pages, the Trustees' decision to block plaintiffs burdened substantially more speech than was necessary and therefore was not narrowly tailored.

Addressing plaintiffs' cross appeal, the panel held that the district court correctly concluded that at the time the

Trustees blocked plaintiffs, it was not clearly established that plaintiffs had a First Amendment right to post comments on a public official's Facebook or Twitter page. The district court therefore did not err by granting qualified immunity to the Trustees as to plaintiffs' damages claim. Finally, the panel determined that it lacked jurisdiction to consider whether the district court erred by denying, without prejudice, defendants' motion to retax costs.

---

## COUNSEL

Jack M. Sleeth Jr. (argued) and Paul V. Carelli, IV, Artiano Shinoff, San Diego, California, for Defendants-Appellants/Cross-Appellees.

Cory J. Briggs (argued), Briggs Law Corporation, Upland, California, for Plaintiffs-Appellees/Cross-Appellants.

---

## OPINION

BERZON, Circuit Judge:

Today, social media websites like Facebook and Twitter are, for many, "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Accordingly, social media sites "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

Unsurprisingly, social media's capacity for facilitating communication and stirring public debate has not been lost on public officials.  From local county supervisors and state representatives to the President of the United States, elected officials across the country increasingly rely on social media both to promote their campaigns and, after election, to communicate with constituents and seek their input in carrying out their duties as public officials.

This case concerns a dispute arising from two public officials' use of social media to communicate with constituents about public issues.  Beginning around 2014, two members of the Poway Unified School District ("PUSD" or the "District") Board of Trustees, Michelle O'Connor-Ratcliff and T.J. Zane (together, "the Trustees"), created public Facebook and Twitter pages to promote their campaigns for office.  After they won and assumed office, the two used their public social media pages to inform constituents about goings-on at the School District and on the PUSD Board, to invite the public to Board meetings, to solicit input about important Board decisions, and to communicate with parents about safety and security issues at the District's schools.

But public engagement with their social media pages was not all 👍s and ❤s.  Two parents of children in the School District, Christopher and Kimberly Garnier, frequently left comments critical of the Trustees and the Board on the Trustees' pages, sometimes posting the same long criticisms repeatedly.  After deleting or hiding the Garniers' repetitive comments for a time, the Trustees eventually blocked the Garniers entirely from their social media pages.  The Garniers sued, asserting that the Trustees violated their First Amendment rights by ejecting them from the social media pages.  After a bench trial, the district court agreed with the

Garniers that their First Amendment rights had been violated. Both parties appeal.

The Garniers' claims present an issue of first impression in this Circuit: whether a state official violates the First Amendment by creating a publicly accessible social media page related to his or her official duties and then blocking certain members of the public from that page because of the nature of their comments. For the following reasons, we hold that, under the circumstances presented here, the Trustees have acted under color of state law by using their social media pages as public fora in carrying out their official duties. We further hold that, applying First Amendment public forum criteria, the restrictions imposed on the Garniers' expression are not appropriately tailored to serve a significant governmental interest and so are invalid. We therefore affirm the district court judgment.

## I. BACKGROUND

### A. Facts

Michelle O'Connor-Ratcliff and T.J. Zane successfully ran for election to the PUSD Board of Trustees in November 2014, positions they still hold. In addition to their private Facebook pages, which they shared only with family and friends, O'Connor-Ratcliff and Zane created public Facebook pages to promote their political campaigns. In 2016, O'Connor-Ratcliff also created a public Twitter page related to her activities as a PUSD trustee.[1]

Only the Trustees could create original "posts" on their public Facebook pages. Members of the public who chose

---

[1] Zane's Twitter page is not at issue in this appeal.

to like or follow the public pages were able to post "comments" beneath the Trustees' posts. Viewers could also register non-verbal emoticon "reactions" to posts, such as a "thumbs-up" reaction to "like" the post, a heart, or an angry face. Facebook automatically truncates lengthy comments that a Facebook user makes on another user's posts. Viewers of the post on which the comment was made must click a "See More" button on the comment to read more than the first few lines of a comment's text. Accordingly, viewers of the Trustees' Facebook pages could easily scroll past the truncated version of long comments they did not wish to read. Unlike on Facebook, when viewing another person's Twitter profile, comments left by other Twitter users on the account owner's posts—called "replies," rather than comments—are not immediately visible. To see those replies, viewers must click on the specific Tweet and then scroll down to see individual replies.

Both Facebook and Twitter provide the Trustees with some ability to moderate the content of comments on their pages. Although the Trustees cannot turn off comments on either platform, they can "delete" or "hide" individual comments, thereby removing them entirely or making them visible only to the Trustee and the person who posted the comment.[2]   Additionally, the Trustees can limit verbal comments by using Facebook's "word filter" function, which allows a page owner to create a list of words that, if

---

[2] At the time the Garniers filed their lawsuit, Twitter did not permit users to hide other users' replies to their Tweets without blocking those users entirely. Twitter adopted a reply-hiding feature in 2019. Kayla Yurieff, *Twitter Now Lets You Hide Replies to Your Tweets*, CNN Bus. (Nov. 21, 2019), https://www.cnn.com/2019/11/21/tech/twitter-hide-replies/index.html; *see also About Replies and Mentions*, Twitter Help Ctr., https://help.twitter.com/en/using-twitter/mentions-and-replies#hidden-reply-video (last visited June 14, 2022).

used in a comment, will prevent the comment from appearing beneath the page owner's post.

The Trustees can also "block" Facebook and Twitter users. Blocking a Facebook user prevents that user from commenting on or registering a non-verbal reaction to the posts on the blocker's page, but the user is still able to continue viewing the public Facebook page. In contrast, on Twitter, once a user has been "blocked," the individual can neither interact with nor view the blocker's Twitter feed.

Although before assuming office, the Trustees originally used their social media pages to promote their campaigns, they continued to use those pages to post content related to PUSD business and the activities of the Board after winning their elections. In the "About" section of her public Facebook page, O'Connor-Ratcliff described herself as a "Government Official," listed her "Current Office" as President of the PUSD Board of Education, and provided a link to her PUSD official email address. Zane titled his Facebook page "T.J. Zane, Poway Unified School District Trustee," and in the "About" section, he described his Facebook as "the official page for T.J. Zane, Poway Unified School District Board Member, to promote public and political information." Like O'Connor-Ratcliff, Zane described himself as a "Government Official," and he described his interests as including "being accessible and accountable; retaining quality teachers; increasing transparency in decision making; preserving local standards for education; and ensuring our children's campus safety."

Some of the Trustees' posts described visits to PUSD's schools and promoted the achievements of the District's students and teachers. In other posts, O'Connor-Ratcliff and Zane reported on PUSD Board-related business. For instance, on several occasions, O'Connor-Ratcliff posted

announcements soliciting students and community members to apply for representative positions with the PUSD Board, including the PUSD Student Board of Education, the Budget Review Advisory Committee, and the Educational Technology Advisory Committee.  The Trustees also posted information about PUSD's Local Control Accountability Plan ("LCAP")—a three-year budgetary plan required by California law "that describes the goals, actions, services, and expenditures to support positive student outcomes that address state and local priorities."[3]  *See* Cal. Educ. Code § 52060.  In those posts, the Trustees invited the public to fill out surveys related to the LCAP formulation process, shared information about in-person community fora related to LCAP planning, and reported on the plans ultimately adopted by the Board.

Additionally, the Trustees posted about the PUSD Board's superintendent hiring and firing decisions, including announcing the Board's decision to terminate then-Superintendent John Collins, inviting members of the public to fill out online surveys and attend community fora regarding the selection of a new superintendent, and providing updates regarding superintendent applicants and the ultimate hiring decision.  The Trustees also posted reminders to the public about upcoming PUSD Board meetings and regularly shared their own recaps of important issues discussed at Board meetings, such as bond issuance decisions, employee contract negotiations, and priorities for the upcoming school year.

Occasionally, the Trustees also used their social media pages to alert the public about safety and security issues at

---

[3] *See Local Control and Accountability Plan (LCAP)*, Cal. Dep't of Educ. (Apr. 13, 2022), https://www.cde.ca.gov/re/lc/.

PUSD. For instance, Zane posted about lockdowns following threats to students, an active shooter incident near one PUSD school, and an ongoing brush fire that forced the evacuation of another PUSD school.

Neither O'Connor-Ratcliff nor Zane established any rules of etiquette or decorum regulating how the public was to interact with their social media accounts. There were, for example, no size or subject limits set for comments. The Trustees both occasionally solicited feedback from constituents through their posts or responded to constituent questions and comments. For instance, in a post providing a summary of important issues discussed at a PUSD Board meeting—one in a series of posts O'Connor-Ratcliff called "The Board according to Michelle"—O'Connor-Ratcliff noted that she had "received some good comments" to prior posts and had "made some changes to the structure" of her Board meeting summaries in response to those comments. In June 2017, Zane posted a San Diego Union-Tribune editorial about PUSD's move from at-large voting to a single-member district system, noting that he "agree[d] with this editorial" and asking constituents, "what say you?"

Among the constituents who frequently commented on the Trustees' social media pages were Christopher and Kimberly Garnier. The Garniers, who have children attending PUSD schools, have for years been active members of the PUSD community. In the years leading up to the dispute at issue in this case, the Garniers were especially vocal critics of the Board, particularly regarding race relations in the District, and alleged financial wrongdoing by then-Superintendent John Collins.[4] To

---

[4] Relations between the Garniers and PUSD further soured around 2014. Following two incidents involving Christopher Garnier, District

express their concerns about these and other issues, the Garniers regularly attended public meetings of the PUSD Board of Trustees, emailed PUSD Trustees regarding their concerns, and met with individual Trustees.

Over time, the Garniers became frustrated with the Trustees' unresponsiveness in these encounters. Starting sometime in 2015, the Garniers began commenting on the Trustees' social media posts. The Garniers' social media comments did not use profanity or threaten physical harm, and almost all of their comments related to PUSD. But the Garniers' comments were often quite lengthy and were frequently repetitive of other comments they had posted on the Trustees' social media communications. For instance, Christopher Garnier posted nearly identical comments on 42 separate posts O'Connor-Ratcliff made to her Facebook page. On one occasion, within approximately ten minutes Christopher Garnier posted 226 identical replies to O'Connor-Ratcliff's Twitter page, one to each Tweet O'Connor-Ratcliff had ever written on her public account. Although there was some variation in their comments, the Garniers' complaints primarily concerned alleged wrongdoing by Superintendent John Collins and race relations at PUSD.

Frustrated with the repetitive nature of the Garniers' comments, the Trustees began deleting or hiding the comments from their Facebook pages. Later, tired of monitoring and deleting or hiding the Garniers' comments individually, the Trustees took more decisive action: Around October 2017, O'Connor-Ratcliff blocked both the Garniers from her Facebook page and blocked Christopher

officials and the Garniers filed a series of legal actions against each another.

Garnier from her Twitter page. Zane likewise blocked the Garniers from his Facebook page.[5]

Sometime after they blocked the Garniers, the Trustees began using Facebook's "word filter" feature effectively to preclude all verbal comments on their public pages. Specifically, in December 2018, Zane added a list of approximately 2,000 commonly used English words to his Facebook word filter, so that any comment using one of those words could not be posted. O'Connor-Ratcliff added a smaller list of about 20 commonly used words to her own filter.[6] The Trustees' use of word filters as a practical matter eliminated all new verbal comments from the Facebook posts, but did not affect viewers' abilities to register non-verbal reactions, such as "liking" their posts with a thumbs-up symbol or selecting another one of Facebook's reaction buttons. Because they were blocked, the Garniers were unable to leave these nonverbal reactions on the Trustees' Facebook pages.

---

[5] At trial, Zane maintained that he never blocked the Garniers from his public Facebook page, only from his personal pages. Screenshots of Christopher Garnier's view of Zane's page show, however, that the comment box and the emoticon reaction features, which appear underneath posts when a user is not blocked, were disabled. Although Kimberly Garnier was blocked from Zane's public Facebook page at the time that the Garniers filed this lawsuit, the district court found that Zane had unblocked her shortly before trial.

[6] It is not clear exactly when O'Connor-Ratcliff began using word filters on her Facebook page. She testified that she believed she began using word filters sometime in 2017, although she was not certain. Screenshots of her Facebook page in the record show that the public could still leave comments on her page as of September 2017.

## B.  Procedural History

After the Trustees blocked the Garniers from their social media pages, the Garniers filed suit against the Trustees under 42 U.S.C. § 1983, seeking damages and declaratory and injunctive relief.  As relevant here, the Garniers alleged that the Trustees' social media pages constitute public fora and that, by blocking them, the Trustees violated the Garniers' First Amendment rights.

After discovery, the Trustees moved for summary judgment.  The district court granted the Trustees qualified immunity as to the Garniers' damages claims but otherwise permitted the case to proceed.  On the merits, the district court concluded that O'Connor-Ratcliff and Zane acted under color of state law for purposes of 42 U.S.C. § 1983 when they banned the Garniers from their social media pages, noting that the Trustees' "posts were linked to events which arose out of their official status as PUSD Board members," that the content of their posts "went beyond their policy preferences or information about their campaigns for reelection," and that "the content of many of their posts was possible because they were 'clothed with the authority of state law.'"  The district court next concluded that the comment portions of the Trustees' public social media pages were designated public fora and that a trial was necessary to determine disputed issues of fact as to whether the Trustees' blocking of the Garniers was a reasonable, content-neutral restriction on repetitive comments.

The case proceeded to a two-day bench trial.  Both the Garniers and the Trustees testified.  After trial, the district court issued findings of fact and conclusions of law and awarded declaratory and injunctive relief to the Garniers.  The district court concluded that although Zane had unblocked Kimberly Garnier on Facebook a few days before

trial, her claims against Zane were not moot because it was "not absolutely clear that Zane could not block Kimberly Garnier again." The district court next determined that the Trustees' decision to block the Garniers was content neutral and intended "to enforce an unwritten rule of decorum prohibiting repetitious speech on their social media pages." The district court nevertheless granted judgment to the Garniers because blocking them indefinitely was not narrowly tailored to the avoidance of repetitive comments on the Trustees' pages. The district court also taxed costs in favor of the Garniers and denied without prejudice the Trustees' motion to re-tax costs, noting that they could re-file their motion after appeal.

The Trustees appealed, challenging both the district court's judgment and the decision to award costs to the Garniers. The Garniers cross-appealed, arguing that the district court erred by granting qualified immunity to the Trustees as to the Garniers' damages claims.

## II. DISCUSSION

On appeal, the Trustees contend that they closed any public fora they may have created on their social media pages by blocking almost all comments on their posts through the use of word filters, mooting the dispute; that creating, maintaining, and blocking the Garniers from their social media accounts did not constitute state action under § 1983; and that, in any event, blocking them indefinitely is a narrowly tailored time, place, or manner restriction. We reject these arguments and affirm.

### A. Mootness

We first address the Trustees' contention that this case is moot.

As described, sometime after the Garniers filed their lawsuit, the Trustees began using the word filter function on Facebook to prevent any new comments from being posted on their Facebook pages. The Trustees assert that, by implementing word filters, they effectively closed their Facebook pages as designated public fora, and that the Garniers therefore "do not have standing" to challenge the decision to block them. Although the Trustees' use of word filters on Facebook is relevant in some respects to the First Amendment analysis of the Garniers' claims, *see infra* Section II.C., we disagree with the Trustees that the use of word filters on Facebook moots this case.

First, in addition to blocking the Garniers on Facebook, O'Connor-Ratcliff also blocked Christopher Garnier from viewing her Twitter page or replying to her Tweets. The Trustees testified at trial only that they used word filters on Facebook. There is no evidence in the record that O'Connor-Ratcliff similarly could or did restrict public comments on her Twitter page. So, whatever changes the Trustees may have made to their Facebook pages, such changes would not affect Christopher Garnier's claim against O'Connor-Ratcliff for blocking him from her Twitter page.

Second, although word filters have limited the public's ability to write verbal comments in response to the Trustees' posts, the word filters have not changed Facebook's non-verbal "reaction" feature, which allows users to offer an emotional reaction emoticon to Facebook posts, such as a "like," "angry face," or "sad face" emoticon. Individuals who have been blocked from a Facebook page, such as the Garniers, cannot provide this non-verbal feedback. Regaining the ability to provide non-verbal feedback to the Trustees' posts would constitute effective relief,

notwithstanding the Trustees' adoption of word filters. *See McCormack v. Herzog*, 788 F.3d 1017, 1024 (9th Cir. 2015) (quoting *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 559 (9th Cir. 2009)). The Garniers' case therefore retains "its character as a present, live controversy." *Id.* (quoting *Siskiyou*, 565 F.3d at 559).

Last, and independently dispositive, the voluntary nature of the Trustees' use of word filters means the dispute here is not moot with respect to the Facebook pages or with respect to the blocking of verbal comments, as voluntary cessation of allegedly unlawful activity ordinarily does not moot a case. "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Accordingly, the party asserting mootness following the voluntary cessation of allegedly illegal conduct bears the "'heavy burden' of making 'absolutely clear' that it could not revert" to its prior behavior. *Fikre v. FBI*, 904 F.3d 1033, 1038 (9th Cir. 2018) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017)).

The Trustees have not carried that burden. They have provided no assurance that they will not, in the future, remove the word filters from their Facebook pages and again open those pages for verbal comments from the public. To the contrary, at trial, O'Connor-Ratcliff contemplated the possibility that she might one day change her Facebook page to again "have some back and forth with my constituents." And although the Trustees have, for now, effectively precluded any new comments on their Facebook pages, they remain "practically and legally 'free to return to [their] old ways' despite abandoning them in the ongoing litigation."

*Id.* at 1039 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).[7] We therefore have jurisdiction to consider the legality of the Trustees' decision to block the Garniers on Facebook both before and after the Trustees began using word filters.

## B.  State Action

"To state a claim under § 1983, a plaintiff must allege the violation of" a federal right "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Whether a government actor "is acting under color of law is not always an easy call, especially when the conduct is novel," and "there is no rigid formula for measuring state action for purposes of section 1983 liability." *Gritchen v. Collier*, 254 F.3d 807, 813 (9th Cir. 2001) (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)).[8]  Rather, determining whether a public official's conduct constitutes state action "is a process of 'sifting facts and weighing circumstances.'"  *Id.* (quoting *McDade*, 223 F.3d at 1139).  "[N]o one fact can function as a necessary condition across the board."  *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751 (9th Cir. 2020) (quoting

---

[7] For similar reasons, Zane's decision to unblock Kimberly Garnier from his Facebook page on the eve of trial does not moot her claim against him.  Zane has put in place no "procedural safeguards" to ensure that he will not again block Kimberly Garnier from his Facebook page. *See Fikre*, 904 F.3d at 1039 (citations omitted).  His decision, without explanation, to unblock Kimberly Garnier just days before trial is not the kind of "unambiguous renunciation of [his] past actions" that "can compensate for the ease with which [he] may relapse into them."  *Id.*

[8] Because the "'color of law' requirement of § 1983 is treated as the equivalent of the 'state action' requirement under the Constitution," *Jensen v. Lane County*, 222 F.3d 570, 574 (9th Cir. 2000), we use those phrases interchangeably in this opinion.

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)), *cert. denied*, 142 S. Ct. 69 (2021). "At bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 748 (internal quotation marks omitted) (quoting *West*, 487 U.S. at 49).

Although "[w]hat is fairly attributable" to the state "is a matter of normative judgment, and the criteria lack rigid simplicity," *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (quoting *Brentwood*, 531 U.S. at 295), we have recognized "at least four different criteria, or tests, used to identify state action," the satisfaction of any one of which "is sufficient to find state action, so long as no countervailing factor exists," *id.* Those tests include: the "public function test," applicable when private individuals are "endowed by the State with powers or functions" that are "both traditionally and exclusively governmental" and therefore "become agencies or instrumentalities of the State," *id.* at 1093 (quoting *Lee v. Katz*, 276 F.3d 550, 554–55 (9th Cir. 2002)); the "joint action test," applicable when "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity," *id.* (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995)); the "compulsion test," applicable when "the coercive influence or 'significant encouragement' of the state effectively converts a private action into a government action," *id.* at 1094 (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 842 (9th Cir. 1999)); and the "nexus test," applicable when there is "such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself," *id.* at 1094–95 (quoting *Brentwood*, 531

U.S. at 295).  The fourth category most closely fits the facts of this case.  Whichever test applies, "the central question remains whether 'the alleged infringement of federal rights [is] fairly attributable to the government.'"  *Id.* at 1096 (alteration in original) (quoting *Sutton*, 192 F.3d at 835).

## 1.  State Action Nexus Analysis

We have never addressed whether a public official acts under color of state law by blocking a constituent from a social media page.  Doing so now, we conclude that, given the close nexus between the Trustees' use of their social media pages and their official positions, the Trustees in this case were acting under color of state law when they blocked the Garniers.

The Trustees' use of their social media accounts was directly connected to, although not required by, their official positions.  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights."  *McDade*, 223 F.3d at 1139.  That is why "seemingly private behavior may be fairly treated as that of the State" if there is "a close nexus between the State and the challenged action."  *Kirtley*, 326 F.3d at 1094–95 (quoting *Brentwood*, 531 U.S. at 295).

Viewed in this light, the line of precedent most similar to this case concerns whether off-duty governmental employees are acting under color of state law.  As here, the focus in such cases is on whether the public official's conduct, even if "seemingly private," is sufficiently related to the performance of his or her official duties to create "a close nexus between the State and the challenged action," or whether the public official is instead "pursu[ing] private goals via private actions."  *Naffe v. Frey*, 789 F.3d 1030,

1037–38 (9th Cir. 2015) (quoting *Brentwood*, 531 U.S. at 295).

Synthesizing such cases, *Naffe* explained that, when a "state employee is off duty, whether he or she 'is acting under color of state law turns on the nature and circumstances of the'" employee's conduct "and the relationship of that conduct to the performance of his official duties." *Id.* at 1036 (quoting *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006)). Specifically, *Naffe* held that a "state employee who is off duty nevertheless acts under color of state law when (1) the employee 'purport[s] to or pretend[s] to act under color of law,' (2) his 'pretense of acting in the performance of his duties . . . had the purpose and effect of influencing the behavior of others,' and (3) the harm inflicted on plaintiff 'related in some meaningful way either to the officer's governmental status or to the performance of his duties.'" *Id.* at 1037 (alterations in original) (first quoting *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996); then quoting *Anderson*, 451 F.3d at 1069; and then quoting *Martinez v. Colon*, 54 F.3d 980, 987 (1st Cir. 1995)).

For example, an off-duty jail officer acted under color of state law while assaulting someone when he "prevented bystanders from intervening in his attack by claiming that he was 'a cop.'" *Id.* at 1037 (quoting *Anderson*, 451 F.3d at 1065–66). By asserting that his actions were "police business," the officer invoked "his law enforcement status," thereby creating a sufficiently "close nexus between his work at the jail" and the assault to constitute state action. *Id.* (quoting *Anderson*, 451 F.3d at 1066). In contrast, an off-duty officer did not act under color of state law while attempting to rob someone when, at the time of the robbery, he "was attired not in a uniform but in blue jeans," "wore a

mask, sunglasses and cap in an attempt to conceal his identity," "did not display a badge," and "denied being a police officer." *Stanewich*, 92 F.3d at 833–34, 838.  Under those circumstances, the nexus between the officer's actions and his official duties was insufficient because "[a]t no point did [he] purport to be acting as a policeman."  *Id.* at 839. What matters, in other words, is whether the state official "abused her responsibilities and purported or pretended to be a state officer" at the time of the alleged constitutional violation.  *Naffe*, 789 F.3d at 1036 (quoting *McDade*, 223 F.3d at 1141).

Applying *Naffe*'s framework here, O'Connor-Ratcliff's and Zane's use of their social media pages qualifies as state action under § 1983.

First, the Trustees "purport[ed] . . . to act in the performance of [their] official duties" through the use of their social media pages.  *Anderson*, 451 F.3d at 1069 (quoting *McDade*, 223 F.3d at 1140).   The Trustees identified themselves on their Facebook pages as "government official[s]," listed their official titles in prominent places on both their Facebook and Twitter pages, and, in O'Connor-Ratcliff's case, included her official PUSD email address in the page's contact information. Zane, for his part, wrote that his Facebook page was "the official page for T.J. Zane, Poway Unified School District Board Member, to promote public and political information."

Consistent with the Trustees' official identifications on their social media pages, the content of the Trustees' pages was overwhelmingly geared toward "provid[ing] information to the public about" the PUSD Board's "official activities and solicit[ing] input from the public on policy issues" relevant to Board decisions.  *Davison v. Randall*

*(Davison II)*, 912 F.3d 666, 680 (4th Cir. 2019). O'Connor-Ratcliff and Zane regularly posted about school board meetings, surveys related to school district policy decisions, the superintendent hiring process, budget planning, and public safety issues. So, both through appearance and content, the Trustees held their social media pages out to be official channels of communication with the public about the work of the PUSD Board.

Second, the Trustees' presentation of their social media pages as official outlets facilitating their performance of their PUSD Board responsibilities "had the purpose and effect of influencing the behavior of others." *Naffe*, 789 F.3d at 1037 (quoting *Anderson*, 451 F.3d at 1069). Zane's Facebook page, as of 2017, had nearly 600 followers, and O'Connor-Ratcliff's had nearly 300. Both Trustees actively solicited constituent input about official PUSD matters, including encouraging constituents to mark their calendars for upcoming Board meetings, to fill out surveys relating to Board decision-making, and to apply for volunteer committees run by the Board. And both Trustees sought feedback from constituents, and responded to their comments. It was by "invoking" their "'governmental status' to influence the behavior of those around" them that the Trustees were able to muster this kind of public engagement with their social media pages. *Anderson*, 451 F.3d at 1069.

Finally, the Trustees' management of their social media pages "related in some meaningful way" to their "governmental status" and "to the performance of [their] duties." *Naffe*, 789 F.3d at 1037 (quoting *Anderson*, 451 F.3d at 1069). The Trustees used their social media pages to communicate about, among other things, the selection of a new superintendent, the formulation of PUSD's LCAP plan,

the composition of PUSD's Budget Advisory Committee, the dates of PUSD Board meetings, and the issues discussed at those meetings. Those posts related directly to the Trustees' duties. More generally, the Trustees' use of social media to keep the public apprised of goings-on at PUSD accords with the Board's power to "[i]nform and make known to the citizens of the district, the educational programs and activities of the schools therein." Cal. Educ. Code § 35172(c).[9]

Moreover, "the specific actions giving rise to" the Garniers' claim—the Trustees' blocking of the Garniers from their social media pages—were "linked to events which arose out of [the Trustees'] official status." *Davison II*, 912 F.3d at 681 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 524 (4th Cir. 2003)). Although the Garniers' repetitive comments often were not directly responsive to any particular post by the Trustees, their comments predominantly dealt with issues related to the PUSD Board's governance of the District, particularly concerns about race relations in the District and racial disparities in suspension rates between white and black PUSD students, as well as allegations of financial wrongdoing by then-PUSD Superintendent John Collins. And the Trustees' stated reasons for blocking the Garniers, discussed in more detail below, were that the Garniers' comments, in their view, tended to "fill up the page," and detract from the messages they wished to communicate in their posts, many of which

---

[9] *See also Role of the Board*, BB 9000(a), Poway Unified Sch. Dist. (adopted Aug. 9, 2018), https://www.powayusd.com/PUSD/media/ Board-Images/BoardPolicy/9000/BB-9000-Role-of-the-Board.pdf (requiring the Board to "ensure that the district is responsive to the values, beliefs, and priorities of the community" and to set "the direction for the district through a process that involves the community, parents/guardians, students, and staff").

pertained to "the performance of [their] official duties." *Naffe*, 789 F.3d at 1036 (quoting *Anderson*, 451 F.3d at 1069). In other words, because the Trustees presented and administered their social media pages as official organs for carrying out their PUSD Board duties, the Trustees' decision to block the Garniers for allegedly interfering with that use of the social media pages "related in some meaningful way either to the [Trustees'] governmental status or to the performance of [their] duties." *Id.* at 1037 (quoting *Anderson*, 451 F.3d at 1069).

Even though they clothed their pages in the authority of their offices and used their pages to communicate about their official duties, the Trustees contend that their use of social media did not constitute state action because the pages, they maintain, were personal campaign pages designed only to advance their own political careers, and because PUSD provided no financial support or authorization for the pages. Many of the Trustees' posts did concern workaday visits to schools and the achievements of PUSD's students and teachers, material that could promote the Trustees' personal campaign prospects. But the Trustees' posts about PUSD school activities generally do not read as advertising "campaign promises" kept or touting their own political achievements. After their election in 2014, the Trustees virtually never posted overtly political or self-promotional material on their social media pages. Rather, their posts either concerned official District business or promoted the District generally.

As to the lack of PUSD funding or authorization, the Trustees' pages did not contain any disclaimer that the "statements made on this web site reflect the personal opinions of the author" and "are not made in any official capacity." *Naffe*, 789 F.3d at 1033. To the contrary, both in

the appearance and the content of the pages, the Trustees effectively "display[ed] a badge" to the public signifying that their accounts reflected their official roles as PUSD Trustees, whether or not the District had in fact authorized or supported them. *Id.* at 1036 (quoting *Stanewich*, 92 F.3d at 838).

The Trustees also contend that their use of social media cannot constitute state action because a legislator "may only act at a properly convened meeting of the legislative body and may only offer a matter for consideration or vote on a matter." This argument is unconvincing.

For one thing, the duties of elected representatives extend beyond "participating in debates and voting." *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995); *accord Does 1–10 v. Haaland*, 973 F.3d 591, 600–02 (6th Cir. 2020); *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006). In addition to those duties, "a primary obligation" of legislators "in a representative democracy is to serve and respond to [their] constituents." *Ballenger*, 444 F.3d at 665 (quoting *Williams*, 71 F.3d at 507). Likewise, in defining the contours of legislative immunity, we have recognized that "not all governmental acts by a local legislator . . . are necessarily legislative in nature," and that conduct of an "administrative or executive" nature, even if outside a legislator's core duties, may be actionable under § 1983. *Trevino ex rel. Cruz v. Gates*, 23 F.3d 1480, 1482 (9th Cir. 1994) (quoting *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 580 (9th Cir. 1984)).

In any event, the core of our state action inquiry is whether the defendant's conduct is "fairly attributable to the State," *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 923 (1982))— that is, whether there is "such a close nexus between the

State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself," *Kirtley*, 326 F.3d at 1095 (quoting *Brentwood*, 531 U.S. at 295). By representing themselves to be acting in their official capacities on their social media and posting about matters that directly related to their official PUSD Board duties, the Trustees "exercised power possessed by virtue of state law and made possible only because" they were "clothed with the authority of state law." *Rawson*, 975 F.3d at 748 (internal quotation marks omitted) (quoting *West*, 487 U.S. at 49).

Given all these attributes of the Trustees' social media pages, we hold that the Trustees' maintenance of their social media pages, including the decision to block the Garniers from those pages, constitutes state action under § 1983.

Although the Trustees acted under color of state law in this case, we reiterate that finding state action "is a process of 'sifting facts and weighing circumstances.'" *Gritchen*, 254 F.3d at 813 (quoting *McDade*, 223 F.3d at 1139). Given the fact-sensitive nature of state action analyses, "not every social media account operated by a public official is a government account." *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021). Rather, courts should look to considerations such as "how the official describes and uses the account," "to whom features of the account are made available," and how members of the public and government officials "regard and treat the account." *Id.* In this case, the pertinent factors all indicate that O'Connor-Ratcliff and Zane unequivocally "cloaked" their social media accounts "with the authority of the state." *Howerton v. Gabica*, 708 F.2d 380, 384–85 (9th

Cir. 1983). We hold that the Trustees acted under color of state law when they blocked the Garniers from their social media accounts.

## 2. Decisions of Other Circuits

In recent years, the Second, Fourth, Sixth, and Eighth Circuits have each addressed claims regarding the blocking of access to government officials' social media pages. Three of those courts' applications of the state action doctrine in those similar cases are consistent with the approach we take here.

In *Davison II*, 912 F.3d 666, the Fourth Circuit held that the Chair of the Loudoun County, Virginia, Board of Supervisors acted under color of state law and violated the First Amendment when she banned a constituent from the "Chair Phyllis J. Randall" Facebook page she created the day before she took office, *id.* at 672–73. Like the posts to the Trustees' pages here, Randall's posts to her "governmental official" Facebook page dealt "with numerous aspects of Randall's official responsibilities," including posting "to notify the public about upcoming Loudoun Board meetings, and the subjects to be discussed during those meetings," "to inform Loudoun County residents about significant public safety issues," and "to communicate with constituents regarding which municipal streets required plowing" following a large snowstorm. *Id.* at 673–74. Additionally, like the Trustees here, Randall used her page to invite members of the public to participate in certain constituent commissions and "to advise the public regarding official actions taken by the Loudoun Board." *Id.* at 674. *Davison II* also noted that Randall identified herself as a "government official" on the page and listed her official county email address in the page's contact info. *Id.*

Citing, as we have, cases involving the conduct of off-duty state officers, the court concluded that Randall's "purportedly private actions" bore a "sufficiently close nexus" with the Board of Supervisors "to satisfy Section 1983's color-of-law requirement." *Id.* at 680 (quoting *Rossignol*, 316 F.3d at 524). Randall's actions, *Davison II* emphasized, were "linked to events which arose out of [her] official status." *Id.* (quoting *Rossignol*, 316 F.3d at 524). In particular, *Davison II* stressed that Randall "used the Chair's Facebook Page 'as a tool of governance'" by providing information to the public about the Board's official activities, soliciting input from constituents on policy issues, and keeping the public informed about public safety issues. *Id.* (quoting *Davison v. Loudoun Cnty. Bd. of Supervisors (Davison I)*, 267 F. Supp. 3d 702, 713 (E.D. Va. 2017)). Additionally, by listing her title and official contact information and categorizing the page as that of a "government official," Randall "swathe[d] the" page "in the trappings of her office." *Id.* at 680–81 (quoting *Davison I*, 267 F. Supp. 3d at 714). The Fourth Circuit concluded that because Randall "clothed the Chair's Facebook Page in 'the power and prestige of h[er] state office" and administered the page to "perform[] actual or apparent dut[ies] of h[er] office," a "private citizen could not have created and used" the page in the same manner that she did. *Id.* at 681 (alterations in original) (first quoting *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979); and then quoting *Martinez*, 54 F.3d at 986).

The Second Circuit conducted a similar analysis in *Knight*, 928 F.3d 226.[10] *Knight* held that the President acted

---

[10] Although the Supreme Court vacated *Knight* as moot after President Donald Trump left office, the opinion nonetheless has persuasive value. *See Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th

in a governmental capacity when he blocked followers of his Twitter account because they posted Tweets critical of him and his policies. 928 F.3d at 234–36. The court first stressed the "substantial and pervasive government involvement with, and control over," the President's Twitter account. *Id.* at 235. *Knight* emphasized that the account was "presented by the President" as "belonging to, and operated by, the President" and was registered to "Donald J. Trump, '45th President of the United States of America, Washington, D.C.'" *Id.* The President's Tweets were also "official records that must be preserved under the Presidential Records Act." *Id.*

*Knight* further explained that the President had used his Twitter account "as a channel for communicating and interacting with the public about his administration," including to announce "matters related to official government business," "to engage with foreign leaders," and "to announce foreign policy decisions and initiatives." *Id.* at 235–36. The account's "like," "retweet," and "reply" functions also helped the President "to understand and to evaluate the public's reaction to what he says and does." *Id.* at 236.

Altogether, the court determined, these facts established that the account was "an important tool of governance and executive outreach," and therefore that the evidence of "the public, non-private nature of the Account" was "overwhelming." *Id.* The court acknowledged, as we have, that "not every social media account operated by a public official is a government account," and instructed that courts should look to "how the official describes and uses the

Cir. 2002) (en banc); *DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1448 n.9 (9th Cir. 1996).

account," "to whom features of the account are made available," and "how others . . . regard and treat the account." *Id.*

In contrast to *Davison II* and *Knight*, the Eighth Circuit in *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021), concluded that Missouri state representative Cheri Toalson Reisch was not acting under color of state law when she blocked a constituent from her Twitter account, *id.* at 823. The court reasoned that Reisch created her Twitter account "when she announced her candidacy for state representative" and that, after taking office, Reisch continued to run the Twitter account "in a private capacity, namely, as a campaigner for political office" rather than as a public official. *Id.* at 823–25.

In support of its conclusion, the court cited, for instance, one Tweet in which Reisch stated she was "proud to deliver results during the first half of session" and another in which she asserted she was "making good on" a promise "to improve our #economy." *Id.* at 824. In contrast to the account in *Davison II*, the Eighth Circuit concluded, the "overall theme of Reisch's tweets—that[] she's the right person for the job—largely remained the same after her electoral victory" and focused on touting "her success in fulfilling" promises made on the campaign trail. *Id.* at 826. Although Reisch "occasionally used the account to provide updates on where certain bills were in the legislative process or the effect certain recently enacted laws had had on the state," those Tweets were "fully consistent with Reisch using the account to tout her record." *Id.*

*Campbell* acknowledged that "Reisch's official duties as a representative extend beyond voting or participating in committee meetings and include things like communicating with constituents about legislation." *Id.* at 827. And the

court recognized that a "private account can turn into a governmental one if it becomes an organ of official business." *Id.* at 826. But the majority in *Campbell* ultimately concluded "that is not what happened here." *Id.* Reisch's "sporadic engagement in" communication about legislation did "not overshadow" her otherwise clear "effort to emphasize her suitability for public office." *Id.* at 827. Unlike the Facebook page in *Davison II*, Reisch's page contained only "occasional stray messages that might conceivably be characterized as conducting the public's business." *Id.* "In short," *Campbell* concluded Reisch's Twitter account was "more akin to a campaign newsletter than to anything else," and so Reisch retained the "prerogative to select her audience and present her page as she sees fit." *Id.*

Although the results in *Davison II* and *Knight*, on the one hand, and *Campbell*, on the other, were different, *Campbell* expressly applied the approach adopted in *Davison II* and *Knight*, so the mode of analysis in these cases was generally consistent.[11] Applying that approach, we conclude that the Trustees' administration of their social media accounts in this case much more closely resembles the use of the accounts in *Davison II* and *Knight* than the use of the account in *Campbell*, as recounted by the majority opinion.

---

[11] We note that Judge Kelly's dissent in *Campbell* makes a strong case that, applying *Davison II* and *Knight* to the facts of *Campbell*, the conclusion should have been that Reich's blockage of Campbell from her Twitter page was state action. *Campbell*, 986 F.3d at 828–29 (Kelly, J., dissenting). For present purposes, however, the pertinence of *Campbell* is that its general approach is in accord with ours and with that in *Davison II* and *Knight*, not whether it was correctly decided on its facts.

First, as in *Davison II* and *Knight*, the Trustees presented their social media pages as belonging to "government officials." O'Connor-Ratcliff listed her official PUSD contact information on her Facebook page and identified herself as "President" of the Poway Unified School District Board of Education on her Twitter page. Zane similarly described his Facebook page as "the official page for T.J. Zane, Poway Unified School District Board Member, to promote public and political information." *See Davison II*, 912 F.3d at 674; *Knight*, 928 F.3d at 235. Moreover, unlike the representative in *Campbell*, who the majority opinion in that case determined used her account not in service of her official duties but rather "as a campaigner for political office," 986 F.3d at 823–25, the Trustees routinely used their social media "as a tool of governance," *Davison II*, 912 F.3d at 680 (quoting *Davison I*, 267 F. Supp. 3d at 713). They posted on their social media pages "to notify the public about" PUSD Board meetings and the subjects "discussed during those meetings," *id.* at 673, "to inform" parents "about significant public safety issues" such as fires and active shooters, *id.*, to announce "policy decisions and initiatives" such as the selection of a new PUSD superintendent, *Knight*, 928 F.3d at 236, and "to understand and to evaluate the public's reaction to what" they did in office, *id.* at 236.

We note that the Sixth Circuit recently held in *Lindke v. Freed* that city manager James Freed was not a state actor when he blocked a citizen from his public Facebook page, adopting a somewhat different analysis from ours and that of the Second, Fourth, and Eighth Circuits. 37 F.4th 1199, 1201 (6th Cir. 2022). Although the court also applied a nexus test for state action, it expressly "part[ed] ways" with the other Circuits. *Id.* at 1206. In doing so, the Sixth Circuit held inapposite state action cases involving off-duty police

officers, on the ground that a police officer's appearance plays a unique role in the ability to invoke state authority. *Id.* Instead, the court relied on prior Sixth Circuit precedents that addressed similar questions by applying a "state-official test," inquiring whether a public official is performing an actual or apparent official duty or whether the action could have been taken without the authority of the person's position. *Id.* at 1202–03. Thus, "[i]nstead of examining a [social media] page's appearance or purpose," the court "focus[ed] on the actor's official duties and use of government resources or state employees." *Id*. at 1206.

We decline to follow the Sixth Circuit's reasoning. Although the uniform of a police officer carries particular authority, our Circuit's analysis of whether a police officer acts under color of law does not turn only on the person's sporting of a uniform or the person's "appearance" alone. Rather, we consider whether the officer self-identified as a state employee and generally "purported . . . to be a state officer" at the time of the alleged violation, an inquiry that considers actions in addition to appearance. *Naffe*, 789 F.3d at 1036–37 (quoting *McDade*, 223 F.3d at 1141); *see also Stanewich*, 92 F.3d at 833 (noting the officer denied being a police officer and did not show a badge). We thus conclude, as did the Fourth Circuit in *Davison II*, that off-duty officer cases are instructive as to analysis of other state employees' conduct, including in the arena of social media.

In short, we follow the mode of analysis of the Second, Fourth, and Eighth Circuits to hold that the Trustees used their social media accounts as "an organ of official business." *Campbell*, 986 F.3d at 826. As with the Facebook page in *Davison II*, a "private citizen could not have created and used" the Trustees' pages in the manner that they did because the Trustees "clothed" their pages in

"the power and prestige of" their offices "and created and administered" the pages "to 'perform[] actual or apparent dut[ies]'" of their offices.  912 F.3d at 681 (alterations in original) (first quoting *Harris*, 605 F.2d at 337; and then quoting *Martinez*, 54 F.3d at 986).  Because they so used their social media pages, the Trustees were state actors.

## C.  First Amendment Violation

As state actors, the Trustees violated the First Amendment when they blocked the Garniers from their social media pages.  The interactive sections of the Trustees' social media accounts constituted public fora.  And even assuming that the Trustees blocked the Garniers only to enforce an unspoken, content-neutral rule against repetitive comments, the Trustees' decision to block the Garniers is not sufficiently tailored to a significant governmental interest to pass First Amendment scrutiny.[12]

### 3.  Forum Analysis

The "extent to which the Government may limit access" to a government forum "depends on whether the forum is public or nonpublic."  *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

---

[12] We review constitutional facts de novo in First Amendment cases, conducting "an independent examination of the whole record" to ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression."  *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)).  We also review de novo the application of law to facts "on free speech issues."  *Lair v. Motl*, 873 F.3d 1170, 1178 (9th Cir. 2017) (quoting *Lair v. Bullock*, 798 F.3d 736, 745 (9th Cir. 2015)).

"A designated public forum exists where 'the government intentionally opens up a nontraditional forum for public discourse.'" *Id.* (quoting *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir. 1999)). To determine whether the government has created a designated public forum, we look "to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." *Id.* at 1075 (quoting *Cornelius*, 473 U.S. at 802). In a designated public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions" are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

A limited public forum, by contrast, is "a sub-category of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.'" *Hopper*, 241 F.3d at 1074 (alteration in original) (quoting *DiLoreto*, 196 F.3d at 965). The "[s]tandards for inclusion and exclusion" for a limited public forum "must be unambiguous and definite"; without "objective standards, government officials may use their discretion . . . as a pretext for censorship." *Id.* at 1077 (quoting *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 251 (3d Cir. 1998)). In a limited public forum, restrictions on speech and speakers are permissible so long as they are "viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* at 1074–75 (quoting *DiLoreto*, 196 F.3d at 965). Put another

way, the restriction must be "consistent with preserving the property for the purpose to which it is dedicated." *DiLoreto*, 196 F.3d at 967.

Social media websites—Facebook and Twitter in particular—are fora inherently compatible with expressive activity. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, . . . and social media in particular." *Packingham*, 137 S. Ct. at 1735 (quoting *Reno v. ACLU,* 521 U.S. 844, 868 (1997)). Social media sites allow users "to gain access to information and communicate with one another about it on any subject that might come to mind" and thereby "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 1737.

The Trustees contend that they always intended their social media pages to be a "one-way" channel of communication. But what matters in forum analysis "is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted." *Hopper*, 241 F.3d at 1075. Before the Trustees began using word filters, their social media pages were open and available to the public without any restriction on the form or content of comments. And far from forbidding comments, the Trustees occasionally solicited feedback from constituents through their posts and responded to individuals who left comments. Although the Trustees eventually began deleting or hiding some lengthy or repetitive comments, they never adopted any formal rules of decorum or etiquette for their pages that would be "sufficiently definite and objective to prevent arbitrary or

discriminatory enforcement." *Am. Freedom Def. Initiative v. King County*, 904 F.3d 1126, 1130 (9th Cir. 2018). The Trustees' suggestion that they had an unspoken policy against repetitive comments does not satisfy the requirement that "[s]tandards for inclusion and exclusion" "must be unambiguous and definite" to create a limited public forum. *Hopper*, 241 F.3d at 1077 (quoting *Christ's Bride*, 148 F.3d at 251). Even an "abstract policy statement purporting to restrict access to a forum is not enough." *Id.* at 1075. *No* policy statement is surely not enough.

Where, as here, the government has made a forum "available for use by the public" and "has no policy or practice of regulating the content" posted to that forum, it has created a designated public forum. *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001). We conclude that O'Connor-Ratcliff's Twitter page is a designated public forum, and that before the Trustees began using word filters to curtail comments on their Facebook posts, the interactive portions of the Trustees' Facebook pages were designated public fora.

As recounted earlier, sometime after blocking the Garniers from their Facebook pages, the Trustees began using a Facebook feature that allows the administrators of public pages to create a list of words and then filter out any comments that use any word on that list. The Trustees assert that, by implementing word filters, they effectively closed their Facebook pages as public fora. But even with the addition of word filters, members of the public not blocked from the Trustees' pages remain able to register non-verbal "reactions" to the Trustees' posts. The Trustees therefore have not closed the interactive portion of their pages entirely. The Trustees' use of word filters has, however, changed the

characteristics of the public forum that now exists on those pages.

That is to say, before adding word filters to their Facebook pages, the Trustees had "no policy or practice of regulating the content" posted to the fora. *Id.* They have since restricted public interaction with their Facebook pages to the use of Facebook's non-verbal reaction icons. In so doing, the Trustees now "exercise the clear and consistent control" over the interactive portions of their Facebook pages "that our cases require to maintain a limited public forum." *Hopper*, 241 F.3d at 1080.[13]

In sum, the Trustees' Facebook pages, before the implementation of word filters on Facebook, constituted designated public fora, and O'Connor-Ratcliff's Twitter page remains a designated public forum. With the addition of word filters that prohibit comments and restrict users to non-verbal reactions, the Trustees' Facebook pages are limited public fora.

### 4. Governmental Interest and Tailoring

Having determined the types of public fora at issue, we now analyze whether the Trustees' decisions to block the Garniers from their social media pages violated the First Amendment. They did.

---

[13] The Garniers do not contend, and the record here does not suggest, that the Trustees began using word filters for viewpoint discriminatory reasons or that the word filters themselves block comments based on their content or viewpoint. We therefore do not address how our analysis might be different if the Trustees' use of word filters was designed to block only critical comments or only comments concerning particular subjects.

We note at the outset that it is a close question whether the Trustees' decisions to block the Garniers were viewpoint discriminatory. Whether in a designated public forum or a limited public forum, "restrictions based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The Trustees maintain that they blocked the Garniers because of the repetitive nature of their comments, not because of their often-critical opinions of the Trustees. Specifically, the Trustees testified that they blocked the Garniers because the Garniers were "spamming [them] repetitively," and the repetitive nature of their comments tended to "fill up the page."

There are reasons to doubt that explanation. For one, even lengthy comments on Facebook and replies on Twitter do not significantly detract from or overwhelm the original post. Facebook automatically truncates lengthy posts. On Twitter, replies to a user's Tweets are not visible from the user's home page. So the Trustees' contention that the Garniers' comments "fill[ed] up the page" and detracted from the "streamlined, bulletin board nature" of their accounts is inconsistent with the technological reality. What is more, the record shows that the Trustees hid or deleted negative comments from the Garniers that were not repetitive but did not similarly hide or delete positive comments from other people. And to the extent the Trustees maintain that they intended to keep their pages as a "streamlined," one-way channel of communication, their replies to constituents' comments undermines that assertion.

In the end, we need not resolve whether the Trustees' decision to block the Garniers was viewpoint discriminatory. Even when viewed as a content-neutral time, place, or manner restriction intended to eliminate repetitive

comments, the Trustees' complete blocking of the Garniers from their social media pages violates the First Amendment.

In a designated public forum, such as O'Connor-Ratcliff's Twitter page or the Trustees' Facebook pages before the implementation of word filters, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions" are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293). Likewise, "speakers can be excluded" only when that exclusion is "narrowly drawn." *Hopper*, 241 F.3d at 1074 (quoting *Cornelius*, 473 U.S. at 800). A time, place, or manner restriction "need not be the least restrictive or least intrusive means of" serving the government's content-neutral interests. *Ward*, 491 U.S. at 798. But it may not "burden substantially more speech than is necessary to further the government's legitimate interests," nor may the government "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799. Accordingly, "the existence of obvious, less burdensome alternatives is 'a relevant consideration in determining whether the "fit" between ends and means is reasonable.'" *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (en banc) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)).

Under this standard, O'Connor-Ratcliff's decision to block Christopher Garnier from her Twitter page and the Trustees' initial decision to block the Garniers from their Facebook pages were not narrowly tailored to serve a significant governmental interest.

**(i)** First, on the record of this case, the Trustees' decision to block the Garniers from the designated public fora did not advance a significant governmental interest. At trial, the Trustees testified that they blocked the Garniers from their social media pages because they believed that the Garniers' repetitive comments had "a net effect of slightly pushing down anything" that the Trustees posted to their pages and tended "to just fill up the page" with irrelevant comments and "visual clutter." In its narrow tailoring analysis, the district court concluded that blocking the Garniers "promoted the legitimate interest of facilitating discussion on [the Trustees'] social media pages." Alternatively, the district court analogized to our case law assessing the application of rules at in-person local government meetings to conclude that the Garniers' comments were "disruptive" because they were "unduly repetitious or largely irrelevant." *See White v. City of Norwalk*, 900 F.2d 1421, 1425–26 (9th Cir. 1990). On appeal, the Trustees rely on the two rationales cited by the district court to support their contention that blocking the Garniers advanced a significant governmental interest.

The record in this case does not support the Trustees' contention that the Garniers' comments actually disrupted their pages or interfered with their ability to host discussion on their pages. Again, Facebook automatically trims lengthy comments, such as some of those left by the Garniers, requiring viewers interested in reading those comments to click a "See More" button to read beyond the first few lines of text. Similarly, on Twitter, replies to a user's Tweets are not automatically visible; a viewer interested in reading replies to a Tweet must click on a particular Tweet and scroll to the replies to view them. And on either platform, viewers of the Trustees' social media pages can, with the flick of a finger, simply scroll past repetitive or irrelevant comments.

Indeed, no matter how many comments or reactions are left in the interactive spaces underneath a Facebook post or a Tweet, the content of the original post remains prominent and unaffected; comments therefore do not, as the Trustees assert, have the effect of "pushing down anything" that they posted or meaningfully distracting from the "streamlined, bulletin board" appearance they say they wanted for their social media pages.

It is apparent that the Garniers' repetitive comments bothered the Trustees. But there is no evidence that the repetitive comments "actually disturb[ed] or imped[ed]" the Trustees' posts or prevented other viewers of the Trustees' accounts from engaging in discussion. *Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (en banc).

Our cases governing the application of rules of decorum at local government meetings are not to the contrary, as they address a meaningfully different risk of disruption than the risk presented by the Garniers' comments. In physical city hall meetings, where there is limited time and space available for public remarks, lengthy, "irrelevant or repetitious" comments "interfere with the rights of other speakers" or prevent the government "from accomplishing its business." *White*, 900 F.2d at 1425–26. The only way to keep unruly speakers from impeding the ability to hear out a broad range of opinions from the public may be to cut off the microphone or to eject the speaker from the room. *See id.* Accordingly, rules of decorum applied to limit disruption at city council meetings "are not facially over-broad where they only permit a presiding officer to eject an attendee *for actually disturbing or impeding a meeting*." *Norse*, 629 F.3d at 976 (emphasis added); *accord White*, 900 F.2d at 1425–26.

In contrast to meetings in the physical world, the features of Facebook and Twitter rendered the Garniers' repetitive comments only minimally distracting. The Garniers' lengthier Facebook comments were automatically truncated, and viewers of the Trustees' pages could easily ignore their comments on either platform by scrolling past them. For that reason, the Garniers' comments did not prevent the Trustees "from accomplishing [their] business in a reasonably efficient manner." *White*, 900 F.2d at 1426. Nor did the Garniers' comments "interfere with the rights of other speakers," who remained free to ignore the Garniers' comments and to leave their own. *Id.*

"Actual disruption means actual disruption," not "constructive disruption, technical disruption, virtual disruption, *nunc pro tunc* disruption, or imaginary disruption." *Norse*, 629 F.3d at 976. The Trustees' concerns about the "visual clutter" created by the Garniers' comments, or the risk that their comments would upset the "nice and streamlined" appearance of their pages, do not on the present record amount to the kind of disruption that alone can support the decision to block the Garniers.

In sum, the Trustees' decision to block the Garniers did not serve a significant governmental interest.

**(ii)** Even if the Garniers' comments did interfere with the Trustees' interests in facilitating discussion or avoiding disruption on their social media pages, the Trustees' decision to block the Garniers "burden[s] substantially more speech than is necessary" and therefore is not narrowly tailored. *Ward*, 491 U.S. at 799. Blocking the Garniers did not stop them from leaving only long, repetitive comments. The blocking prevented them from leaving any comments at all, no matter how short, relevant, or non-duplicative they might be. Further, O'Connor-Ratcliffe's blocking of Christopher

Garnier on Twitter prevented him from even viewing her Tweets.

The overbreadth of the Trustees' decision to block the Garniers is particularly apparent on Facebook, where the Trustees had at their disposal "easily available alternative modes of regulation" that would have had "considerably less impact on speech"—namely, the ability to delete or hide unduly repetitive comments. *Berger*, 569 F.3d at 1043 (quoting *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1041 (9th Cir. 2006)). The Trustees did exactly that before blocking the Garniers. The Trustees testified that deleting the Garniers' comments took only a few seconds. The easily available alternative of deleting only repetitive comments rather than blocking the Garniers entirely accomplished the same goal—avoiding potentially disruptive repetitive posts—without eliminating the Garniers' ability to interact with the Trustees' pages to the extent they did so in an appropriate manner.[14]

Alternatively, the Trustees could have established and enforced clear rules of etiquette for public comments on their pages, including rules against lengthy, repetitive, or off-topic comments. Had the Trustees established such rules, it is possible that the Garniers would not have continued to post the same messages repeatedly, knowing that such comments could lead to their being blocked from the page. But the Trustees never established any rules of engagement with their social media pages and so never determined whether such rules would be an effective means of reducing assertedly disruptive comments.

---

[14] As noted above, Twitter began permitting users to hide replies to their Tweets in 2019.

Although the narrow tailoring requirement is "just moderately stringent," regulations of speech must "be targeted at real problems, and carefully calibrated to solve those problems." *Id.* at 1059. In light of the minimal disturbance caused by the Garniers' comments and replies and the alternative methods available to the Trustees to address any such disturbances, we conclude that the Trustees' blocking of the Garniers on Twitter and on Facebook was not narrowly tailored.

**(iii)** Nor is the Trustees' decision to continue blocking the Garniers after the Trustees began using Facebook's word filter feature to block all comments "reasonable in light of the purpose served by the forum." *Hopper*, 241 F.3d at 1075 (quoting *DiLoreto*, 196 F.3d at 965). Whether a speech restriction in a limited public forum is reasonable in light of the forum's purpose depends on "whether the limitation is consistent with preserving the property for the purpose to which it is dedicated," in this case, as a space where the Trustees can post content of their choice without any verbal comments from the public. *DiLoreto*, 196 F.3d at 967.

Given their implementation of word filters, the Trustees' continued ban of the Garniers serves no purpose at all relating to the Garniers' repetitive comments. The Trustees' extensive word filters prevent the Garniers or anyone else from commenting on their Facebook posts. The only impact presently of blocking the Garniers is that it prevents them from registering non-verbal emoticon reactions to the Trustees' posts. But the Trustees have not asserted *any* interest in limiting non-verbal reactions. Nor does the record provide any reason to believe the Garniers' use of non-verbal reactions, even repetitively, would disrupt or detract from the Trustees' pages or the content of their posts. Because blocking the Garniers from their Facebook pages, in their

present form, adds nothing to the Trustees' goal of eliminating comments on their posts, that restriction is not "reasonable in light of the purpose served by the forum." *Hopper*, 241 F.3d at 1075 (quoting *DiLoreto*, 196 F.3d at 965).

At trial, O'Connor-Ratcliff suggested that even though nobody can comment on her Facebook page any longer, unblocking the Garniers would prevent her from changing the way she uses her Facebook page—for instance, by deciding at some future date "to have some back and forth with my constituents." But O'Connor-Ratcliff's suggestion that she might choose in the future to include more back and forth with the public undermines her articulated rationale for excluding the Garniers—that their comments detracted from the streamlined, bulletin board functioning of her social media pages. And, in any event, if the Trustees later decided to open their Facebook pages to public comments again, they would still be able to hide or delete unduly repetitious comments or establish express rules of decorum prohibiting such comments. Until that time, the Trustees' speculative concerns about future disruption are not a sufficient reason to block the Garniers from interacting with their pages when those pages now block all comments anyway. Again, "[a]ctual disruption means actual disruption." *Norse*, 629 F.3d at 976.

We conclude that the Trustees violated the Garniers' First Amendment rights by blocking them from the Trustees' social media accounts and that the district court was therefore correct to grant the Garniers declaratory and injunctive relief.

### D. Qualified Immunity

We need not dwell on the Garniers' contention, on cross-appeal, that the district court erred by granting qualified immunity to the Trustees as to the Garniers' damages claim. The district court concluded that, at the time that the Trustees blocked the Garniers, it was not clearly established that the Garniers had a "First Amendment right to post comments on a public official's Facebook or Twitter page." We agree.

"Qualified immunity shields federal and state officials from money damages" unless the official violated a statutory or constitutional right that "was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Until now, no Ninth Circuit or Supreme Court authority definitively answered the state action and First Amendment questions at issue in this case.

"[A]bsent controlling authority," "a robust 'consensus of cases of persuasive authority'" can clearly establish law for purposes of qualified immunity. *Id*. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). But there was no such consensus here. At the time the Trustees blocked the Garniers from their pages in the fall of 2017, there were no court of appeals cases addressing similar facts. Only in the five years since the Trustees blocked the Garniers did four circuits decide cases concerning the First Amendment's application to the decisions of government officials to block members of the public from their government social media accounts. As discussed, applying similar modes of analysis, two of those circuits found First Amendment violations and one did not, while one circuit applied a different mode of analysis and found no violation. *See supra* Section II.B.2. Whether or not those four cases (one vacated, *see Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220

(2021)), taken together, would constitute a sufficient consensus for qualified immunity purposes, the contours of the right asserted here were not at the time of the events in question "'sufficiently clear' that every 'reasonable official would [have understood] that'" the actions taken violated that right. *al-Kidd*, 563 U.S. at 741 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The Garniers attempt to avoid this conclusion by describing the right at issue in this case extremely generally, as the "right to criticize public officials" free from retaliation. But the Supreme Court has exhorted us "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)). Given the novelty of applying the First Amendment and state action doctrines implicated here to the burgeoning public fora of social media, we cannot say that reasonable officials in the Trustees' position were on notice that blocking the Garniers from individual government officials' public social media pages could violate the First Amendment.

## E. Costs

Finally, the Trustees contend that the district court erred by denying, without prejudice, their motion to retax costs. We lack jurisdiction to address that question.

Following trial, the district court taxed costs in favor of the Garniers. The district court then denied the Trustees' motion to re-tax costs, noting that "[t]his case is currently on appeal" and that "[t]he grounds for appeal implicate any decision the Court would render on Defendants' Motion to Re-Tax Costs." Accordingly, the district court denied the

motion "without prejudice to Defendants' refiling their motion after the appeal has concluded."

Under 28 U.S.C. § 1291, this Court "has jurisdiction to hear appeals of 'final decisions' of the district court." *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017) (quoting *Wakefield v. Thompson*, 177 F.3d 1160, 1162 (9th Cir. 1999)). "A ruling is final for purposes of § 1291 if it (1) is a full adjudication of the issues, and (2) clearly evidences the judge's intention that it be the court's final act in the matter." *Id.* (quoting *Elliott v. White Mountain Apache Tribal Ct.*, 566 F.3d 842, 846 (9th Cir. 2009)). Consistently with those criteria, where the district court denies a party's motion for attorney fees or costs "without prejudice to renewal, if appropriate, following final disposition of all matters on appeal," we lack jurisdiction to review the district court's denial without prejudice. *Id.* at 1203, 1212–13.

As in *Reed*, the district court here denied the Trustees' motion to re-tax costs without prejudice and "clearly intended to revisit the question" following appeal. *Id.* at 1212. We therefore lack jurisdiction to review the district court's order denying the motion to re-tax costs.[15]

## III.   CONCLUSION

The protections of the First Amendment apply no less to the "vast democratic forums of the Internet" than they do to

---

[15] *Reed* concerned an award of attorney fees, not costs as here. *Reed*, however, turned not on the relief requested but on the conclusion that the district court in that case, by denying the motion for fees without prejudice, "made no 'final decision'" and did not "clearly evidence[]" an intention that its ruling "be the court's final act in the matter." 863 F.3d at 1212 (first quoting *Wakefield*, 177 F.3d at 1160; and then quoting *Elliott*, 566 F.3d at 846).

the bulletin boards or town halls of the corporeal world. *Packingham*, 137 S. Ct. at 1735 (quoting *Reno*, 521 U.S. at 868).  That is not to say that every social media account created by public officials is subject to constitutional scrutiny or that, having created a public forum online, public officials are powerless to manage public interaction with their profiles.  As this case demonstrates, analogies between physical public fora and the virtual public fora of the present are sometimes imperfect, and courts applying First Amendment protections to virtual spaces must be mindful of the nuances of how those online fora function in practice. Whatever those nuances, we have little doubt that social media will continue to play an essential role in hosting public debate and facilitating the free expression that lies at the heart of the First Amendment.  When state actors enter that virtual world and invoke their government status to create a forum for such expression, the First Amendment enters with them.

**AFFIRMED.**